UNITED STATES v. RAND. See Case No. 15,008.

---

## Case No. 16,117.

### UNITED STATES v. RANDALL.

[2 Cranch. C. C. 412.] 1

Circuit Court, District of Columbia. May Term, 1823.

CRIMINAL LAW—DISCHARGE OF JUROR.

After the jury is sworn. in a capital case, and the cause has been opened. the court cannot,

1 [Reported by Hon. William Cranch, Chief Judge.]

without the prisoner's consent, discharge a juror, at his own request.

Indictment [against the negro Randall] for a rape on Maria Scheals.

---

## Case No. 16,118.

### UNITED STATES v. RANDALL.

[Deady, 524.] 1

District Court, D. Oregon. Jan. 23, 1869.

CRIMINAL LAW—SUFFICIENCY OF EVIDENCE—PRESUMPTIONS—PEREMPTORY CHALLENGES—LARCENY FROM MAILS.

1. The verdict of a jury regularly given is presumed to be right until the contrary appears, and should be sustained by the court, if the evidence, by any fair construction, will warrant such a finding.

2. False and contradictory statements by the defendant about the material circumstances of the crime with which he is charged, are badges of guilt.

3. The falsification of records by the defendant, with reference to a matter in which he is charged or suspected of wrong-doing or liable to be so suspected or charged, is strong presumptive evidence of guilt.

4. Special circumstances not consistent with defendant's innocence, together with a particular opportunity and temptation to commit the crime charged. to be considered in support of verdict of guilty.

5. Section 2 of the act of March 3, 1868 (13 Stat. 500), regulating peremptory challenges in criminal cases, does not give the right to such challenge except in capital cases. because when the act was passed such right did not exist by law in any other cases, but was only permitted by rule of court.

[Cited in U. S. v. Coppersmith, 4 Fed. 200.]

6. When it appears from the evidence that the defendant has made a false statement about the circumstances of the commission of a crime, with which he is charged, he may show that he had good reason to believe at the time the statement was true.

7. Gold dust in packages not weighing more than four pounds and paying letter postage, is mailable matter, and whether it is not, under section 12 of the act of July 1, 1864 (13 Stat. 337), any person employed in the post-office who steals the same from a letter in the mail, is guilty of a crime.

[8. Cited in State v. Coosaw Min. Co., 45 Fed. 808. to the point that the courts of the United States take judicial notice of the acts of congress, and they need not be set forth or specially referred to in any proceeding before them.]

The indictment in this case was found under section 12. of the act of July 1, 1864

1 [Reported by Hon. Matthew P. Deady. District Judge. and here reprinted by permission.]

(13 Stat. 337), and filed in this court on November 11, 1868. It charges that on July 28, 1868, one Thomas Smith, of Auburn, in Baker county, Oregon, deposited in the post-office at Auburn, a registered letter numbered 36, enclosed in registered package envelope numbered 28; and that said registered letter contained 12½ ounces of gold dust, of the value of $200, the property of said Smith, and was addressed to Yee Kang, in San Francisco, and intended to be conveyed by post to said last mentioned place. That the defendant [E. G. Randall] on August 3, 1868, was employed in the postoffice at Portland, Oregon, being then and there postmaster thereof, and that on said day, said registered letter, registered and numbered as aforesaid, came into the possession of the defendant, who then and there unlawfully opened the same, and did steal therefrom the 12½ ounces of gold dust aforesaid, contrary to the form of the statutes, etc. On November 11, the defendant was arrested upon a bench warrant, and gave bail in the sum of $10,000, with two sureties.

On November 14, the defendant by his counsel demurred to the indictment, and for causes of demurrer specified: (1) That gold dust is not mailable matter, and the taking the same is not an offence against the laws of the United States; and (2) that the indictment contains two offences which are separate and distinct—namely, opening a letter and taking from the same an article of value. After a cursory examination of the subject, the demurrer was overruled, with the understanding that the first question made by it could be made in arrest of judgment, if necessary. The second question made by the demurrer was abandoned on the argument, and not particularly mentioned or considered in the disposition of it. Thereupon the defendant pleaded not guilty to the indictment. On Monday, November 23, a jury was formed in the case and heard it until the following Wednesday, when the case was given them in charge. On November 26, the jury being unable to agree, were discharged without giving a verdict. Thereupon, on motion of the defendant, the case was set for trial on Monday, January 4, 1869. On the last mentioned date, the case was, on the motion of the United States, continued until the Wednesday following, on account of the absence of a material witness. On Wednesday, January 6, a jury was formed in the case and heard it until the following Friday, when the case was given them in charge, and on the day following the jury returned into court, and gave their verdict that the defendant was guilty as charged in the indictment, and also recommended him to the mercy of the court. Thereupon, on motion of the United States, it was ordered that the defendant give bail with sufficient sureties in the sum of $15,000, and that in default thereof, he be committed in close custody; and the defendant gave bail accordingly. On motion of the defendant, it was ordered that he be allowed until Monday, January 11, to file a motion for a new trial and in arrest of judgment, or either of them.

On the last mentioned date the defendant filed a motion for a new trial, for the reasons and causes following: (1) That the evidence is insufficient to justify the verdict. (2) That the verdict is against law. (3) Error of law occurring at the trial, and excepted to by the defendant, namely: I. Refusing to allow defendant's peremptory challenge to Charles Sweigle, a juror. II. Refusing to admit the letter marked No. 3, from one Koontz, at Umatilla, Oregon, dated October 1, 1868, in evidence.

And also a motion in arrest of judgment—Because the facts stated in the indictment do not constitute a crime in this—that gold dust is not mailable matter.

Both motions were submitted by the defendant's counsel, with an appeal for delay in the consideration of them, to give counsel an opportunity to examine the subject, and also to give time to the defendant to obtain further testimony on his behalf. The application for delay was taken under advisement by the court until Saturday, January 16. On the last mentioned day the application for delay was refused by the court; and thereupon, the motions for new trial and in arrest of judgment were argued by counsel. The court took until Saturday, January 23, to consider the matter.

David Logan, for the United States.
William Strong and Joseph N. Dolph, for defendant.

DEADY, District Judge. Before proceeding to consider the motions made by defendant, I deem it proper to state briefly the reasons for refusing the application for delay on last Saturday. A court will not delay judgment indefinitely in any case, merely to give the defendant time to discover, or rather to try to discover new evidence on which to ask a new trial. Such an arbitrary exercise of power, it appears to me, would be an abuse of judicial discretion, amounting to a maladministration of justice. The defendant has not been hurried into this trial against his will and without due preparation. On the contrary, he has chosen his own time. The second trial was set for January 4, in the same term as the first, against the remonstrance of the United States attorney, who insisted that the case should go over to the March term, according to the usual practice of the court. At the same time, if there were any questions of law arising upon either of these motions, affecting the right and justice of the case, and about which there was room for serious doubt, it would be proper to continue the matter for further consideration and argument; and even to adjourn the case

into the circuit court, to await the presence there of the justice of the supreme court, assigned to this circuit. In the meantime, if the defendant, from any source not now apparent, should be able to discover any testimony, tending to show his innocence; he might have the benefit of his discovery on the hearing of his motion for new trial. With a view of giving the defendant the benefit of this delay, if it should appear there was good ground for it, the questions of law arising on these motions were carefully examined and considered. In my judgment they did not admit of serious argument or doubt. Therefore the application for delay was refused.

The motions must now be disposed of. The first ground of the motion for new trial raises the question: Is the verdict contrary to the evidence? The testimony given to the jury was sufficient proof of the following facts and circumstances: That on July 28, 1868, one Thomas Smith, being then postmaster at Auburn, Oregon, mailed at Auburn, for himself, 12½ ounces of gold dust of the value of $200, to Yee Kang, in San Francisco, and that Smith duly registered the letter containing the parcel of dust and numbered it 36, and enclosed the same in registered package envelope numbered 28, directed to Sacramento, Distributing Postoffice, Cal. That this registered package 28 arrived at The Dalles on the evening of Saturday, August 1, in good condition, and that the same was duly forwarded from thence, in the Portland pouch, in like condition, on Monday, August 3, to the office at Portland. That the mail from the Dalles to Portland was then carried by steamboat and railway, and usually arrived at Portland about the middle of the afternoon of the day on which it left The Dalles. That the mail from Portland to Sacramento was then carried in a through pouch under a brass lock, daily, and left Portland at or about 6 a. m., and then reached Sacramento in from 5½ to 6 days—the latter being the schedule time. That on August 10, registered envelope 28 with registered letter 36 enclosed, reached the office at Sacramento in bad condition—the end of the letter and registered envelope being torn open and the contents of the former abstracted.

These, in brief, are the facts proved concerning the mailing of the letter containing the dust and the loss of the latter while being conveyed by post from Auburn, Oregon, to San Francisco, California. The reasonable inference from these facts is, that the gold dust was taken from the letter by some one in the Portland office. Indeed, during the argument to the jury, counsel for the defendant substantially admitted this to be a correct conclusion. Now let us see what facts and circumstances were proven concerning the question of who took the dust from the letter. On August 17, the postmaster at Sacramento wrote to Mr. Quincy A. Brooks—at Portland—the special postal agent for Oregon, Washington and Idaho, enclosing registered envelope 28 and calling his attention to the matter. Owing to absence from home, Brooks did not receive this letter until about August 29. Thereupon he made minute of the affair and called upon the defendant at his postoffice, to learn what he could concerning the missing package in that office. The defendant or being requested by the agent, went to his record of registered matter in transit, accompanied by the latter, and examined it, particularly the page containing the entries of packages arriving from August 1 to 7 inclusive, and could find no entry concerning envelope 28. At the same time the agent looked over the defendant's shoulder, and could not see any entry concerning the package. The defendant then told Brooks that he recollected the package and that it passed the Portland office all right. On September 4, Agent Brooks sent a circular letter of inquiry (form 46) concerning envelope 28, to the postmasters on the route beginning with the one at Baker City—the first office west of Auburn—and directing each one to state in writing thereon what condition the envelope or package was in when it passed his office, if at all, and what he knew about the missing enclosure, and to then forward it to the next postmaster on the route, and so on to Sacramento, from which office the letter was to be returned by mail to Agent Brooks at Portland. In reply, the postmasters on the route between Auburn and Portland—seven in number—certified that registered package envelope 28, mailed at Auburn July 28, and directed to Sacramento, passed their respective offices in good order at the dates following—arrived at and left Baker City in mail pouch marked Umatilla, way, on July 29; passed Union on July 30; arrived at La Grande, evening of July 30, and left morning of July 31; passed Orodell on July 31; passed Cayuse on July 31; passed Umatilla on August 1; arrived at The Dalles on August 1, and left in Portland pouch for Sacramento, August 3. This circular letter with the foregoing endorsement on it reached the defendant not later than September 19. He did not, as therein directed, at once state in writing thereon his answer to the inquiry of the agent, and then forward it to the postmaster at Sacramento. But he retained the circular letter until October 12 or 13, when he mailed it to Sacramento, first making his statement thereon as hereinafter set forth. Early in the morning of Sunday, August 2, 1868, in the Blue Mountains, in the vicinity of Pelican ranch, and a few miles west of Orodell, and about fifty miles west of Auburn, and near a one hundred miles west of Umatilla, the mail, then being carried in a stage, on the route between Auburn and Portland, was robbed by armed men. In this robbery, registered package envelopes, numbered 26 and 30, and directed to Portland, and 31 directed to Sacramento, and 32 directed to Umatilla, were torn open and their contents abstracted.

The envelopes, except No. 32, came to Portland in due course of mail, without their contents, on the afternoon of Tuesday, August 4, and then passed into the possession of the agent. The one numbered 32, he soon after received. The news of this mail robbery and the opening of registered package envelopes therein, reached Portland, by telegraph from The Dalles, on the afternoon of Monday, August 3, and was published that afternoon in the Evening Commercial, a paper then published and circulated in Portland. About September 6, the defendant and Brooks met in the Portland postoffice, when the defendant, without being in any way interrogated upon the subject, said to Brooks, that he thought that registered package envelope 28 had been robbed in the Blue Mountain mail robbery above mentioned. About September 18, the defendant called upon Agent Brooks at his office in Portland, and asked to be shown envelope 28, and also the four envelopes which were torn open and robbed in the Blue Mountains. Brooks showed them to him and he made a minute of the examination and went away. About September 26, defendant told Agent Brooks that he was satisfied that envelope 28 was robbed in the Blue Mountain mail robbery, and that he could prove it.

In reply to the inquiry in the circular letter, the defendant stated as follows: "Post-Office, Portland, Oregon, Oct. 3, 1868. Reg. Pkg. Envelope No. 28 reached this office Aug. 4th; left on the morning of the 5th in locked sack marked Sacramento. Nothing unusual was noticed to create suspicion. (Signed) E. G. Randall, P. M." In this circular the word "passed" was first written and then a line drawn through it and the word "reached" written above it; and the figure 3 was first written after the word "Aug.," and afterwards the figure 4 written over and upon it. On October 9, the defendant, without being called upon by the duties of his office so to do, voluntarily wrote to the postmaster at Sacramento as follows: "Sir: From the enclosed letters, and those of a similar nature from postmasters along the route, I have reason to believe that registered letter 36 in Pkg. Envelope 28, mailed at Auburn, 28th July, for your office, was in the mail that was robbed August 2, but which passed this office without being detected. Yours respectfully, (Signed) E. G. Randall, P. M."

On November 10, Thomas Smith, the postmaster at Auburn, called on the defendant at the postoffice in Portland, to inquire about registered package envelope 28, and told the defendant the amount of gold dust in it when mailed at Auburn. Defendant then said to Smith that he remembered something about the envelope going through the Portland office, but that it was torn open at the time, and he thought it did not contain any package —that the contents were gone. That he ought to have stopped the envelope and

called Brooks' attention to it, and that he thought he had done wrong. Smith then said, that if such was the case, the envelope must have been broken open at The Dalles, to which the defendant replied, that he did not know. On September 19, the defendant wrote to Thomas Smith at Auburn, concerning envelope 28, and also envelopes 30, 31 and 32 which were broken open in the robbery of the mail in the Blue Mountains. To this Smith replied under date of September 26, in which he stated substantially, that envelope 28 was mailed by himself on July 28, and contained $200 in gold dust, and that it could not have been in the mail that was robbed, unless it had been detained; and that he was afraid it had been robbed by some brother postmaster. That envelopes 30, 31 and 32 were mailed at Auburn on July 31, 1868, and that 30 and 31 were mailed by Chinamen, and each contained $50, and that 32 was mailed by himself, and contained $200 in gold dust. On September 21, defendant wrote to the postmaster at Baker City, and also to the one at The Dalles. Of the latter he asked the question—When did registered envelopes 30 and 31, mailed at Auburn July 31, pass your office? To this The Dalles postmaster replied on same sheet, by return mail—They arrived at this office on Monday, August 3, and left in Portland pouch, on Tuesday, August 4. Of the former the defendant asked the question—When did registered envelopes 28, 30 and 31, mailed at Auburn, July 28 and 31, pass your office? I desire to know if they were in the same mail. To this the postmaster at Baker City replied, on same sheet, under date of September 25, that envelopes 30 and 31 were forwarded from that office on August 1. Envelope 28 may possibly have been in same mail, but that it was entered on register of registered matter in transit on July 29, and was forwarded the day following. That 30 and 31 were entered on register on August 1, and were forwarded either the same or the following day.

The circular letter of Agent Brooks and the letter of the defendant, dated October 9, and addressed to the postmaster at Sacramento, and professing to cover letters from postmasters on the eastern end of the route, reached Sacramento by mail on October 19 —one month after the circular reached Portland. They were all immediately returned to Portland by mail—the circular being addressed to the agent. A few days before November 1, the agent found his circular and defendant's letter to the postmaster at Sacramento, with several letters to defendant from postmasters on eastern end of route, enclosed in an unsealed envelope, in his box at the Portland office, and addressed either to himself or defendant, he is not certain which. The agent took them into possession, and produced them on the trial. On the circular, and at the end of the last and incomplete line of the certificate of the post-

master at La Grande, there is written in pencil, the words—"arrived August 1, left August 2"—and at the left end of the certificate at right angles with the lines, in pencil also, the words—"left August 2." These words were not written by the postmaster at La Grande. They were not on the circular when it left Sacramento for Portland. They were on it when the circular was taken from the office by Brooks, and the writing strongly resembles that of the defendant's. The envelopes that were robbed in the Blue Mountain mail robbery, did arrive at La Grande on August 1, and departed August 2. The inference is reasonable that these words were clandestinely written upon the circular in the Portland office for the purpose of misleading the agent and others who might be engaged in the investigation, into the conclusion that envelope 28 left La Grande August 2, and was therefore robbed in the Blue Mountains, and not in the Portland office. The presumption is that the circular was addressed to Brooks at Portland, by the Sacramento postmaster. That was the direction of the circular. But the agent found it in his box in an unsealed envelope with letters belonging to the defendant. This being so, some one in the Portland office must have intercepted the circular, and taken it out of the envelope, and after making this interpolation in, or addition to the certificate of the postmaster at La Grande, placed it in the agent's box.

In August, 1868, the defendant was postmaster at Portland, and had been for the period of near three years. At that time he had two clerks in his employ—D. F. Fox and Lyman Chittenden. The former had been in the postoffice some time, and the latter since the June previous. The mail from The Dalles was usually opened upon its arrival in the afternoon, by Fox and Chittenden—the defendant being generally present, but seldom assisting in the opening or distribution. The Sacramento mail was made up the next morning before six o'clock, the hour of departure, by Fox and Chittenden, the defendant being very seldom present. The book containing the record of registered matter in transit, was in the special charge of the defendant, and was kept by him either in his private back office in an adjoining building, or in his desk in the front of the postoffice room. At the opening of the mails, it was customary for the clerks to lay all registered package envelopes one side of the table where they were sorting the mail, and the defendant, if present, took them for the purpose of making the necessary entry concerning them in the register. If the defendant was not present, one of the clerks took them and laid them on his desk in the postoffice for the same purpose. On November 14, Agent Brooks, acting under instructions from the department at Washington, took possession of the Portland office and official books and papers. Among these was the record of register matter in

transit kept by the defendant, and examined by him and the agent with reference to envelope 28. This book the agent took into his private custody and produced it on the trial. It is not a book of the printed blanks such as the postoffice regulations require to be kept, but a common blank book of foolscap paper, ruled for the purpose. One page of it is covered with the entries made between August 1 and 7 inclusive of both dates. Only two packages are entered as arriving August 3, 1868, the one mailed at Fisher's Landing on the same day, and destined to San Francisco, and the other mailed at Salt Lake, July 14, and destined to Oregon City. Three packages are entered as arriving August 4— the first mailed at Sacramento, July 30, and destined to Sauvie's Island; the second, mailed at Rickreall, July 27, and destined to "Contract Office, Salt Lake;" and the third, mailed at Astoria, August 4, and destined to Salt Lake. No entry concerning envelope 28 is now apparent to ordinary observation, but between the two lines on which the entries are made concerning the second and third packages arriving on August 4, an entry has been made concerning envelope 28, and since erased. When attention is called to it, some portions of the entry can be distinguished and read with the naked eye, but with the aid of a magnifying glass, the whole entry can be readily made out. The month and the day of the month of this interlined and erased entry are indicated by the use of the points or marks which are ordinarily substituted for ditto, under the word "August" and figure "4." These are not erased. Then comes the number of the envelope (28), next the place of mailing (Auburn), then follows the date of mailing (the ditto marks for July and the figures 28), and lastly the place of destination (Sacramento). The "S" in Sacramento is a peculiarly shaped letter, and bears a striking resemblance to the other capital "S's" in the record, and also to those in the letters of the defendant to the postmasters at Baker City, The Dalles, and Sacramento. The letter "A" in Auburn is not a proper capital "A," but a small "a" enlarged, and used as a capital. Elsewhere in this record where "a" begins a word, it is written in the same way. The word "Auburn" occurs often in the record, and appears very much like the word "Auburn" in this erased entry. The fair inference is, that this entry was made after the one above and below it, or otherwise it would have been written upon a line and not between them, and from the same facts there is much reason to infer that the entry was not made when it purports—August 4—but afterwards. There can be no doubt but that this entry was erased after the one on the line below it was entered, for in making the erasure the tops of the capital letters in the words of "Astoria" and "Salt Lake," in the line below, were scratched off, and have since been touched up, but as the surface of the paper was broken by the erasing, the ink

used in amending these letters spread out, so that the amendments are very palpable.

These facts and inferences concerning the question who took the gold dust in the Portland office, are proven by the evidence of the prosecution, except the letter of the postmaster at Baker City to the defendant in reply to his, which was introduced by defendant. On the trial, neither party cast any suspicion upon Chittenden, but the defendant insisted that Fox alone committed the crime with which the former was charged. Upon this question other evidence was introduced by both parties, which I prefer, for the present, to state substantially, rather than to say what facts were or were not proven by it. On Thursday, November 12, the judge of this court, upon the application of the United States attorney, issued a warrant for the arrest of Fox as a material witness for the prosecution in this case, under section 7 of the act of August 8, 1846 (9 Stat. 73). On the same day, Fox gave bail to appear as a witness in the case in the sum of $5,000, with two sureties, one of them being his wife's brother, Dr. Jacob S. Giltner. Before daybreak the next morning, the other surety in the undertaking of bail surrendered Fox, and he has remained in the jail of this county, as a witness, ever since. Putnam Smith, a broker, being called by the defendant, testified, that on August 6, 1868, he purchased of some one, he did not know who, 12 ounces and six pennyweights of gold dust, for which he gave $15¼ an ounce. That he made an entry in his book of the purchase at the time, as of "mixed dust," by which he meant dust taken from different camps or diggings; and that he bought dust once of Fox, but could not say when or what amount. He could not say that it was in August, but thought it must have been before the state fair at Salem, in 1868, and that nothing was said by Fox as to where he got the dust. That on November 10, Fox came into his place of business and placed the following letter, enclosed in a sealed envelope and addressed to Put. Smith, on his desk, and went out without saying a word, O. B. Gibson being in the room at the time: "Portland, Tuesday Morning—Mr. Put. Smith, Dr. Sir: Randall tells me that Regt. Package affair, has been taken before the grand jury. When called upon I must clear everything. Need I fear anything? Drop me a line, good Put., and oblige. Yours, to serve always"—without any signature. That this letter was written by Fox, was not seriously questioned. Being the statement of a person out of court, and not a party to the action, it was not admissible in evidence upon the trial of the defendant, but when offered by the defendant, the prosecution consented to its being read to the jury, and it was read accordingly. In answer to the testimony of Putnam Smith in regard to the purchase of gold dust, the prosecution proved by Thomas Smith that the gold dust stolen from envelope 28 was placer dust of superior quality and all from one diggings.

To show the guilt of the defendant, either singly or in conjunction with Fox, the prosecution called as witnesses, the wife of Fox and her brother, Dr. Jacob S. Giltner. The former testified, that a few days after the indictment was found and after Fox had been surrendered by his bail, she visited the defendant to ascertain if he was a friend of her husband's. In this conversation the defendant said to witness that if Fox would do as he had agreed or as his friends said he would, that defendant and his friends would be Fox's friends, but that if not, he could not expect any help from him. That gold dust was not mailable matter, and stealing it from the postoffice was not a crime. That defendant was not guilty and would be cleared. That Fox would be in trouble about it but a little while, as defendant had influence with the senators and would get him pardoned immediately. On the cross-examination this witness, when asked if defendant did not say, that if Fox would come out and tell the truth about it, the defendant and his friends would be Fox's friends, answered, "Yes." When asked again by the prosecution to state in her own words what defendant said to her in this particular, she replied substantially as at first—that if Fox would do as he had agreed or as his friends said he would, etc. The examination and cross-examination on this point was carried on some time without any change of result, the witness continuing to state on the examination what she did at first, and on cross-examination to answer "Yes" to the interrogative statement of defendant's counsel. Giltner testified that in the night of November 12, defendant came to his office and said that Fox had confessed, and that he had better leave on the steamer for Victoria and from there he could get to the Sandwich Islands. That witness had better get Fox out of the way, as it would be a disgrace to witness, his brother-in-law. That witness had better get Fox off on the steamer, and the one going to leave that night at four o'clock. Witness declined to follow defendant's advice, saying that he could not afford to pay Fox's bail of $5,000, and that he wanted him to tell the truth about it. Defendant then said to witness, that gold dust was not mailable matter, and that the case would be taken out of the United States court; but if this failed, then defendant and witness with their influence with Senators Williams and Corbett could get Fox pardoned. The defendant proved that neither the Wright nor Active were in this port on November 12, and that at that date no other steamers were running between this port and Victoria; and also that the defendant had maintained a good reputation for honesty in this community, in which he had lived for several years before this charge was made.

On the evening of Thursday, January 7,

at the close of the testimony, the defendant offered to read in evidence, for the purpose of impeaching a witness called by the prosecution, what purported to be the record of the conviction of one Jacob Giltner of a crime of counterfeiting, at Danville, Pennsylvania. The reading of the paper was objected to, because it lacked the certificate of the presiding judge to the attestation of the clerk. The court took the matter under advisement until the next morning, when counsel for the defendant asked leave to withdraw the offer to read the paper, which was allowed.

This is the case upon which the jury found the defendant guilty, and now the court is asked to set their verdict aside. If it is contrary to the evidence it ought to be set aside, but not otherwise. A verdict without evidence or against evidence, ought not to be allowed to stand in any court or case, but a verdict which is warranted by any fair construction of the testimony ought not to be set aside, although the court upon the same evidence would come to a different conclusion.

U. S. v. Martin [Case No. 15,731], was an indictment under the same statute substantially as this. The defendant being a mail carrier, was indicted for embezzling a letter from the mail bags in his custody containing bank notes. The evidence was wholly circumstantial, but the defendant was found guilty. A motion was made to set aside the verdict because it was contrary to evidence, which was denied, and the defendant sentenced to ten years' imprisonment. In considering the motion, Mr. Justice Holman, delivering the opinion of court, says: "In reviewing the verdict of a jury regularly given, the verdict must be presumed to be right until the contrary appears, and it should be sustained by the court, if the evidence, by any fair construction, will warrant such a finding. A court is not authorized to set a verdict aside simply because, if they had been on the jury, they would have found a different verdict. It is not sufficient that the verdict may possibly be wrong, but that, after giving a proper weight to all the evidence, it cannot be right. This verdict is given on what is called circumstantial evidence, and the court feel disposed to give due weight to the arguments which have been drawn from reported cases, where innocent individuals have been convicted and punished for supposed crimes, which were never committed or committed by others. These arguments show the necessity of extreme caution in convicting on circumstantial evidence, but do not prove that circumstances may not be sufficiently strong to authorize a conviction, or that circumstances are not to be relied on in proof of guilt. If a train of circumstances are not deemed sufficient to produce conviction, the penal laws in relation to many offences, especially those against the postoffice regulations, would be a dead letter." This is good law and sound sense, and the circumstances of the case in which it was delivered, make it particularly applicable in this case. This verdict was fairly given. There had been a former trial, so that the defendant was well informed of the nature of the evidence and arguments which would be used against him. He has had every facility and aid in making his defence that able counsel, wealth, zealous friends and position could give him or command. The jury were strangers to him, and as a whole as intelligent and respectable as I ever saw in this state or elsewhere.

Notwithstanding the proof, it is possible that the defendant is innocent. But absolute certainty is not required or attainable in matters depending upon human testimony or judgment. Moral certainty is all that is expected in the verdict of a jury. It will not be denied but that the circumstances proven point to the conclusion that either the defendant or Fox committed this crime singly, or that they were accomplices, and committed it together. The jury, having come to either of two of these conclusions, must have found the defendant guilty. They were the judges of what facts were proven, and of the proper inference to be drawn from them respecting the guilt or innocence of the defendant. This court cannot say that in deciding these questions they were clearly wrong, or that they acted contrary to the evidence, and therefore it ought not to disturb their verdict. Indeed I am constrained to think that the most reasonable conclusion from the facts and circumstances proven is, that the defendant, either alone or with the assistance of Fox, committed the crime.

Consider for a moment the extraordinary and inconsistent conduct of the defendant concerning the package from the time it reached his office until the time of his indictment and arrest. By the postoffice regulations he was required to register every registered package envelope that passed his office, and note its condition. If anything unusual appeared about the package, it was made his duty to notify the postal agent of it at once. According to the division of labor in the Portland office, the keeping of this register was the business of the defendant. No entry was made of the transit of this package through the office. This, although a circumstance to be considered, of itself concludes nothing. The defendant may have failed to register the package from mistake or carelessness, or it may not have reached his hands or come to his knowledge. But in any event, when called upon to give information concerning the matter, by the postal agent, he was required to tell the truth, and nothing but the truth, so far as he knew, and the presumption is that an innocent man would. On August 29, defendant said to Brooks, that he recollected the package and it passed the office all right. On September 6—That he thought the package was robbed in Blue Mountain mail rob-

bery. On September 20—That he was satisfied that package was robbed in Blue Mountain mail robbery, and that he could prove it. October 3, in writing on the circular letter—That the package reached the Portland office on August 4 and left on August 5—nothing unusual was noticed to excite suspicion—which was equivalent to certifying that the package passed in good order. October 9, in a letter to postmaster at Sacramento—That he had reason to believe that package robbed in Blue Mountain mail robbery on August 2, but passed Portland office without being detected. November 10, to Thomas Smith—That he remembered something of the envelope going through the Portland office, but that it was torn open at the time and he thought contents abstracted. Here are six different statements about this package, made by the defendant, not casually or inadvertently to strangers or unconcerned persons, but with more or less deliberation to officers of the postoffice department and the owner of the stolen dust, all of which were, as a matter of fact, false, and involved three different and irreconcilable accounts of the matter. The certificate endorsed upon the agent's circular was a deliberate official act in writing, done upon the requirement of a superior officer and under the solemn sanction of an official oath. There never was any ground for the defendant's believing or saying that the package was robbed in the Blue Mountains. On the contrary, at the time he made his certificate on the circular and wrote to the postmaster at Sacramento, he had positive evidence before him, in the letters from postmasters on the eastern end of the route and their official certificates on the circular, that the package reached Umatilla on Friday, July 30—two days in advance of the mail that was robbed and near a hundred miles west of the place of the robbery. The defendant's efforts to put the agent and the Sacramento postmaster on this false scent, betrays a consciousness and a fear of the truth. The package did reach the Portland office on August 3, and of this there can be no doubt. So the defendant, acting apparently under the influence of the fact, first wrote in his certificate. Afterwards he altered the date to August 4, so as, apparently, to make it possible that the package might have been in the mail that was robbed. The certificate should have stated the truth known to the defendant that his official register contained no entry of the package. These contradictions and misstatements and attempts at misleading the officers and person intrusted are all badges of guilt. But this is not all of the defendant's statements about the package. On the former trial, J. H. Koontz, the postmaster at Umatilla, in August, 1868, testified that in October he had a conversation with defendant upon the subject of registered package envelope 28, when the defendant said, "He remembered about the package, but had no note of it in his office, and that he thought contents either dropped or taken out at The Dalles." True, this testimony was not given to the jury that found this verdict, because the witness was unable to attend this trial on account of sickness. But in a motion to set aside a verdict and grant a new trial, it is proper to consider all the testimony that appears to exist in the case.

Then we come to the interlineation and erasure concerning envelope 28 in the record of registered matter in transit, kept by the defendant. This was an entry after the fact, and therefore suspicious. It was not in the book when examined by the defendant and Brooks on August 29, although it should have been made for nearly a month previous. The defendant then said there was no entry in the register concerning the package, and Agent Brooks looking on, over defendant's shoulder, saw none. The entry must therefore have been made long after the package arrived at the office, and after the inquiry had been set on foot as to what had become of it and who had stolen it. The register is an official book and kept for the public and subject to public inspection. The defendant is bound only to make true entries therein and those to be made contemporaneous with the fact to which they relate. He has no right to destroy the book or erase entries once made in it. The falsification of records, either by interlineations or erasures, with a reference to a matter, in which the party making such falsification, is suspected or charged or liable to be suspected or charged with neglect or wrongdoing, is strong presumptive evidence of guilt. This interlineation was a change of the record—an afterthought, as an answer to the suspicions which the defendant must have seen, were pointing towards his office as the place of the theft of the package. The erasure was another afterthought, so as to make the record comport with the later explanations of the defendant—that the package had been torn open and lost its contents or been robbed of them east of Portland. Such a statement would be flatly contradicted by the entry that the package had arrived in good order. Therefore it was erased. This, of course, was in legal effect and office understanding an entry of arrival in good order—because the entry said nothing to the contrary. That this interlineation and erasure were made by the defendant the jury might fairly presume from the fact of his having the special custody of the book, and it being his special business to make the entries therein. But the fact that sufficient remains of the entry, to show that it was in the handwriting of the defendant, puts the matter beyond dispute. It being shown to a moral certainty that the envelope arrived at the defendant's office with the package of gold dust, and that the latter was abstracted from the envelope while there, the circumstances of the false and contradictory statements of the defendant concerning the package, and the interlineation and erasure of the entry relating

to it, were sufficient to authorize the jury to conclude, that the defendant, either alone, or with the assistance of Fox, stole the dust.

As to the testimony of Mrs. Fox and Dr. Giltner, I have not taken it into account in the foregoing consideration. The jury within their power of judging of the credibility of a witness, and the true import of conversations which are based upon prior conversations, or occurrences known to both the witness and defendant, but only incidentally or imperfectly shown to them, might have fairly drawn some conclusions from the testimony of these witnesses, none of which would tend to show the defendant's innocence, but the contrary. For instance, the conversation between defendant and Mrs. Fox indicates that already some friends of the defendant had been trying to induce Fox to take upon himself the whole guilt of the crime, and thereby save the defendant harmless. In return, the defendant, by himself and friends, was to save Fox from actual punishment, either upon the plea that gold dust was not mailable matter, or by procuring him an immediate pardon. The interview between the defendant and Giltner points to the same conclusion. If the defendant was conscious of his own innocence and of Fox's guilt, the most natural and proper course for him to have pursued was to have complained of him, instead of furtively bargaining for Fox's testimony on his own behalf, upon the promise of procuring the former an immediate pardon—a promise which the defendant had neither the right to make nor the power to perform.

It is also proper to consider the fact that the robbery of the mail on August 2, was known to the defendant about the hour that envelope 28 came to his office. This may have suggested the feasibility of abstracting the contents of this envelope, and escaping detection by attributing the loss to the robbery. In pursuance of this plan, the envelope when relieved of its contents, would be detained over the next day, August 4, and started for Sacramento on August 5, so as to arrive at the latter place, in point of time, as if it had been in the mail that was robbed in the Blue Mountains. The accompanying "Return registered letter bill" would be detained also, so as to keep company with the registered envelope. This was easily done. There was no other envelope arrived at Portland in the mail of August 3, directed to Sacramento distributing postoffice, but No. 28. The return bill enclosed in a common envelope and similarly directed would necessarily be the one which related to envelope 28. This theory accords with the fact as to when the plundered envelope and return bill arrived at Sacramento. The usual time then occupied in making the trip between Portland and Sacramento was 5½ days. The schedule time was six. The envelope and letter bill reached Sacramento about one o'clock p. m. of August 10. If the envelope and letter bill had

left Portland at six o'clock a. m. of August 4, then it would have been 6½ days on the way —more than the schedule time, and a full day more than the usual time. But supposing that they left in the mail of the morning of August 5, then the time consumed in the transit would be the usual time, at that season—5½ days. It being morally certain that envelope 28 and the return letter bill reached the Portland office, in good order, on the afternoon of August 3, and that they reached the Sacramento office, with the contents of the former abstracted, on the afternoon of August 10—after a period of 6½ days—it is a very reasonable conclusion, not only that the envelope was robbed in the Portland office, but that it and the letter bill were detained there for that purpose and on that account, from the morning of August 4 to that of August 5.

The letter of Fox to Put. Smith, to say the least of it, is evidence of more or less conference and confidence between the defendant and Fox on this subject. It would seem that they had a common interest in, or knowledge of the matter. The defendant seems to have been watching the action of the grand jury then in session engaged in the investigation of crimes, and the accusation of criminals. At this time, if defendant was wholly innocent, he must have been satisfied that some one in the office was guilty. He retained Fox in his employ—made no complaint against him—but communicated to him the private intelligence that the matter was to be taken before the grand jury, which the latter, in turn, hastened to communicate to the receiver of the dust, and ask his advice in the premises. This scrawl, read by the light of all the other facts in the case, indicates that Fox knew of this theft, and probably had been used as a tool to dispose of the stolen dust.

Besides all these, there are other circumstances which tend to support the hypothesis of the defendant's guilt. His detention of the circular letter for nearly a month, instead of answering the question propounded and sending it forward at once to Sacramento. He was not charged with the investigation of the matter, but was asked a question concerning his own office. If he knew nothing about the envelope, and there was no entry in the register concerning it, he should have certified so at once. Impliedly his certificate asserts that there was an entry concerning the envelope in his register, when there was not, unless it be the interlined and erased one. The letters which the defendant wrote to the postmasters, appear to have been written with a design to suggest that envelope 28 was in the mail robbery of August 2. The very fact that defendant stepped out of his sphere to write them at all, tends to show that he had some fear that if the investigation was left to the postal agent, it might not result as he, the defendant, desired it to do.

In the motion for a new trial, no objection is made to the ruling of the court refusing to

allow Fox's statement out of court, to be given in evidence. But in the argument of the motion and everywhere else, we are met with the plea that Fox has confessed the theft, and the defendant is not guilty. The fallacy of this must be apparent to every one who will dispassionately consider the matter for a moment. If Fox's admissions could be given in evidence to prove the defendant's innocence, when Fox was placed on trial he might show that these admissions were false, and were made for the purpose of wrongfully procuring the acquittal of this defendant, or he might show that he·was many miles from the place when the crime was committed, and therefore it was physically impossible for him to have committed it. Upon the trial of defendant, Fox's statements out of court are mere hearsay. Besides Fox might confess his guilt in pursuance of an agreement with the defendant's friends, for the purpose of procuring the acquittal of defendant, for a consideration, or when in fact they were both guilty. Fox was the best witness as to what he knew, and if the defendant wanted it to go to the jury, he should have called him as a witness. On the first trial this was done. Fox answered all the questions asked him by defendant except two, which he declined answering on the plea that the answers might criminate himself. These questions were—Whether any package of gold dust came down in the mail bags from The Dalles about August 1? and, Whether he had any gold dust transactions with Put. Smith? For aught that appeared, this might have been a mere pantomime, enacted before the jury, in pursuance of a previous agreement, for the purpose of leading their minds to the conclusion that Fox was guilty, and the defendant not. To prevent this, the court instructed the jury that the defendant was on trial and not Fox, and if Fox declined to answer a question, as he might, no inference was to be drawn from the refusal, either for or against the defendant. On the second trial the defendant called Cartwright, the district attorney, as a witness, who swore that since the first trial, he had promised Fox, that if he would tell all he knew about the theft, and he should be satisfied he told the truth, he would make him a government witness, and he should not be prosecuted. For this reason the defendant declined to call Fox as a witness on the second trial, and the prosecution being satisfied to submit the case to the jury without his testimony, he was not examined at all. But counsel for the defendant, while acknowledging the correctness of the general rule laid down by the court on the question of admitting Fox's outside statements to the jury, on Randall's trial, still indirectly complain that they were not permitted to do so; even when they declined to call him, and let the jury hear his account of the matter, given under the sanction of an oath, and in the presence of the defendant. Either Fox would tell the truth as a witness or not. If he would, then the failure of the defendant to call him, gives reasonable ground to presume that his testimony would tend to convict the defendant. If, however, the defendant had reason to believe that Fox could not be trusted to tell the truth on the witness stand, then certainly, and independent of the fact that they are mere hearsay, the defendant ought not to ask his admissions or statements made out of court without the sanction of an oath to be received in evidence —admissions made too in pursuance of a promise from the defendant and his friends, to save Fox from punishment if he should get convicted himself on account of them.

The second ground of the motion for a new trial—that the verdict was against law— was not argued by counsel and needs no particular consideration by the court. Indeed, I am not certain as to what question is intended to be raised by it. The charge to the jury was in the main oral. and time will not permit its being written out now. No exception was taken to it by either party, and I understood from defendant's counsel that the defence was well satisfied with it. The verdict is not against the law given the jury by the court, for under the charge the jury were at liberty to find the defendant guilty or not guilty, according as the facts and the proper inferences from those facts might in their judgment require.

The first error of law alleged to have occurred at the trial, was the refusal of the court to allow the defendant's peremptory challenge to Charles Sweigle, juror. According to the rules and practice of this court, established since 1864, by the adoption of section 155 of the Criminal Code (Or. Code, p. 467), the defendant was entitled to six peremptory challenges, and no more. Before challenging Sweigle, the defendant had challenged peremptorily six jurors, which challenges had been allowed. At common law, strictly speaking, a peremptory challenge to a juror was not allowed in any case. But in progress of time a practice grew up to allow them, in favor of life, in capital cases. Beyond this, peremptory challenges were not allowed at common law. In modern times, in most of the United States, the practice or law has gone to the other extreme, so that the number of peremptory challenges allowed a defendant enables him, in many cases, to form a jury that is morally certain to acquit or at least to disagree.

By section 30 of the act of April 30, 1790 (1 Stat. 117), peremptory challenges in United States courts are limited to treason and other capital cases. The laws of the states allowing peremptory challenges in other cases do not apply, unless made a rule of court. U. S. v. Cottingham [Case No. 14,872]. The case last referred to arose under section 21 of the act of March 3, 1825, substantially the same as this. A clerk in the Albany postoffice was indicted for opening a letter and stealing

therefrom. The court, Mr. Justice Nelson presiding, held that the defendant was not entitled to any peremptory challenges under the laws of the United States. nor under the law of the state of New York, as the latter had not been adopted by the court. On March 3, 1868, an act was passed. "regulating proceedings in criminal cases and for other purposes" (13 Stat. 500). The second section of this act provides, that in capital cases the defendant shall have but twenty peremptory challenges, and the United States five; and, also, that "in a trial for any other offence in which the right of peremptory challenge now exists, the defendant shall be entitled to ten and the United States to two peremptory challenges." Heretofore this court has always construed this statute as not extending the right of peremptory challenge to any case not capital, on the ground that the right could not be said to exist when it was not given by law, but merely depended upon a rule of court. If otherwise, then this act, instead of establishing an uniform rule upon this subject, which appears to have been the object of it, would allow peremptory challenges in this state, because there is already a rule of court allowing them here, and exclude them in New York, because there is not such a rule there. This provision of the statute is evidently founded upon a misapprehension of the subject, and is nugatory. The question is a technical one and the decision of it in no way affects the justice of the case.

The second error of law alleged to have occurred on the trial, was the refusal to admit in evidence a letter of October 1, 1868, written by J. H. Koontz. and addressed to the defendant. Koontz was postmaster at Umatilla in the early part of August. 1868, but his brother, J. A. Koontz, was his deputy and performed the duties of the office. J. H. Koontz wrote the letter sometime after he had ceased to be postmaster. He was a witness at the former trial. but absent at this on account of sickness. The letter was offered in evidence to show that the defendant, when he wrote to the Sacramento postmaster under date of October 9—had reason to believe that envelope 28 was in the mail that was robbed August 2—did have a reason so to believe at that time, even if it was a mistake. The right to introduce this letter to show that fact was rested on the ground that this Koontz letter was enclosed in the letter to the Sacramento postmaster. and therefore entitled to be read as a part of that admission of the defendant. The court ruled that the defendant might read to the jury any letter that was enclosed in the one to the Sacramento postmaster, because the prosecution having read that to the jury the defendant was entitled to read the other as a part of the same statement or admission. The court also ruled, that any letter which the defendant sent the Sacramento postmaster with his of October 9 as the ground of his belief therein mentioned, might be read to the

jury to show how far the defendant was warranted or justified in expressing the opinion or making the statement to the Sacramento postmaster that he did, but that information or letters not mentioned or disclosed at the time of making a statement in regard to envelope 28, could not be read by the defendant to the jury.

Taking these rules as a guide in the premises, the court refused the Koontz letter to be read to the jury, because it did not appear from the testimony that it was enclosed in the defendant's of October 9, addressed to the postmaster at Sacramento. This is the only ruling made in the case that upon reflection I am not satisfied with. The difficulty was in the facts and not in the law. and grew out of the indistinctness of the testimony as to what letters reached Sacramento with the defendant's, or in it; and as to how the letters of the defendant's were returned to the Portland office and came into Brooks' box. Lewis remembered but two letters in the Sacramento postoffice with the defendant's, and this is not one of them. though he knew there were others; and it might have been placed in the open envelope in Brooks' box by the defendant, without having been to Sacramento at all. Yet I am inclined to think that it would have been safer to have inferred that it was one of the inclosures in the defendant's letter, from the fact that it was found in company with it in Brooks' box after the return of the latter from Sacramento. But if this were an error of judgment, I am satisfied that it worked no possible harm to the defendant. It will not be contended that this letter in any way bears directly upon the question of the defendant's guilt or innocence. It was only offered to qualify the effect of a circumstance. from which, with others, the jury were asked to infer the defendant's guilt. In other words, it was offered to prove that the defendant had good reason or some reason to write the postmaster at Sacramento that he believed envelope 28 was in the mail robbery of August 2, and therefore we are not to infer, because the envelope was not in the robbery, that he was telling a willful falsehood for the purpose of putting the department on the wrong scent, and keeping the pursuit from himself.

But the letter from J. H. Koontz does not show that envelope 28 was in the robbery of August 2, nor furnish any reason or ground for the defendant thinking or saying so. Here is the letter: "Postoffice. Umatilla, Oregon, Oct. 1st, 1868.—To E. G. Randall, P. M., Portland. Dear Sir: At the request of the P. M., I write you in answer to yours of Sept. 21. Reg'd Pkg., envelope No. 28 came to this office on the 1st of August, being Saturday, and left in the mail on Monday at the same time that those four packages left that were broken open and robbed on the morning of the 2d of Aug. The mails that arrive at this office Saturday lay over till Monday, and in

the meantime, on Sunday evening, another mail from east arrives, and both go down on Monday: I can't say certain that all went down in the same lock-sack, but such might have been the case, as we were sometimes compelled to put both mails together, in order to keep sufficient sacks to go on the two routes above, namely, Wallawalla and Boise City. So No. 28, mailed at Auburn July 28, left this office August 3." Now this letter says that envelope No. 28 reached Umatilla Saturday, August 1, and that the mail robbery took place on Sunday, August 2, in the Blue Mountains, near one hundred miles east of Umatilla. Can any one pretend that this is authority or even a decent excuse for the defendant's writing to the Sacramento postmaster that envelope 28 was in the mail that was robbed in the Blue Mountains of August 2? Certainly not. Besides, the defendant had made this statement to Brooks before he had any of these letters. Again, at the time the defendant wrote this letter to the postmaster at Sacramento, he had all the official statements of all the postmasters on the route before him, on the circular letter. These all concluded in stating that envelope 28 was two days ahead of the mail that was robbed, and that it left The Dalles for Portland in good order on the morning of August 3. This Koontz letter is a mistake in regard to envelope 28 not leaving Umatilla until August 3. It left on Saturday morning, August 1, and went to The Dalles by land. On the last trial, Koontz explained it in his testimony. The mail leaves Umatilla six times a week for The Dalles—Mondays, Wednesdays and Fridays by water, and Tuesdays, Thursdays and Saturdays by land. It comes up on opposite days. For instance, the land mail comes to Umatilla from The Dalles on Friday evening, and returns on Saturday morning, but not until the eastern stage comes in —which often comes in in the night. The mail is made up for The Dalles the next morning, and a letter that came in from La Grande on Friday evening, July 31, would be entered on the register as of Saturday, August 1, and go in The Dalles the same day. This was the fact in regard to envelope 28. J. H. Koontz was the postmaster, but his brother attended to the business, and when he wrote this letter, some time after he went out of office, he saw envelope 28 was registered on Saturday, August 1, and he inferred that it came on the evening of that day, and as there was no mail carried on Sunday, he rightly concluded from these premises, that it left for The Dalles on Monday, August 3, in same mail with robbed packages, but he was mistaken in his premises. But, be this as it may, the letter so far from countenancing the opinion that envelope 28 was in mail robbed in the Blue Mountains on August 2, shows directly the contrary—that the envelope was in Umatilla on August 1, from twelve to twenty-four hours ahead of that mail.

The motion for a new trial is overruled.

As to the motion in arrest of judgment, a statement of the statutes in regard to the matter and a few comments will dispose of it. Section 12 of the act of July 1, 1864 (13 Stat. 337), re-enacting section 21 of act of March 1, 1825 (4 Stat. 107), provides: "If any person employed in any department of the post-office establishment, etc., shall secrete, embezzle or destroy any letter, packet, etc., with which he or she shall be intrusted, or which shall have come into his or her possession and intended to be conveyed by post, etc., such letter, packet, etc., containing any note, bond, draft, check * * * or other article of value, etc., or if any such person, etc., shall steal or take any of the same out of any letter, packet, etc., such person shall, on conviction of any such offence, be imprisoned not less than ten years, not exceeding twenty-one years, etc." Tried by this definition, the act committed by the defendant was a crime. The defendant was a person employed in the postoffice. Envelope 28 came into his possession and was intended to be conveyed by post. It contained an article of value—12½ ounces of gold dust—and the defendant by the verdict of the jury is found to have taken the same out of such envelope or letter therein. Even if the statutes defining mailable matter do not include gold dust in the category, still the taking or stealing it from a letter in the mail by a person employed in the post-office would be a flat violation of the section just read, and a crime. It does not follow that because an article is not enumerated as mailable matter that therefore it can be stolen from the mails by those interested with their conduct and transportation, with impunity, or in the pithy language of counsel for the United States, "because gold dust is not mailable, it does not follow that it is stealable." As argued by counsel for defendant, a postmaster might object to being responsible for articles not permitted to be carried in the mails, but no one should object that he is prohibited from stealing from the mails, whether the article be rightfully there or not.

Section 16 of the act of March 3, 1863 (12 Stat. 704), provides: "No postmaster shall receive to be conveyed by the mail any packet or package which shall weigh more than four pounds, except books published and circulated by order of congress." The reasonable inference from this section is, that the mailability of matter depends upon its weight, and not its kind or quality. To the same effect is section 25 of the same act, which reads: "On all matter not enumerated as mailable matter and to which no specific rates of postage are assigned, and which shall nevertheless be mailed, the rate, if the same shall be forwarded, is established at the rate of letter postages." Section 456 of the postoffice regulations prescribes: "Money and other valuables, sent

by mail are at the risk of the owner, but in case of loss the department will endeavor to discover the cause, and where there has been a theft, to punish the offender." These instructions being promulgated by the postmaster general, under authority of an act of congress, have the force of law. Section 32 of the act of March 3, 1863, authorized the postmaster general to establish a uniform plan for the registration of valuable letters. Under this system, envelope 28 was being carried, through the mails, when broken open.

In U. S. v. Marsellis [Case No. 15,724], on a special verdict, judgment of conviction was given against the defendant for taking two letters containing each a twenty-five cent piece in silver. The case was argued before Justices Nelson and Betts, and no question seemed to be made that it was not a crime to steal coin from the mails, because it was not mailable matter. This judgment was given in 1849, while the post-office act of 1845 [5 Stat. 748], which the defendant relies on, was in force. There is no statute of the United States which provides specifically that coin is mailable matter, any more than gold dust. Yet I apprehend that a packet of either of them, not weighing over four pounds and prepaid at letter postage rates, is mailable matter; and whether this be so or not, there can be no doubt but that it is a crime against the United States to take or steal either of them from the mails.

To conclude: after a long and careful examination of the case, I can find no sure ground upon which to question the legality or rightfulness of this verdict or to arrest or delay the judgment of conviction which the law declares shall be given against the defendant in consequence of it.

Sentence: Thereupon the district attorney moved for judgment, and the court asked the defendant if he had anything to say why sentence should not be passed upon him. The defendant rose and said: "Your Honor:—I am innocent of this crime, as sure as there is a God in Heaven, and every one connected with the prosecution knows this full as well as I do. It is the most damnable piece of persecution that was ever perpetrated against a white man. I feel certain that time will reveal my innocence and bring the guilty to justice."

The court then pronounced sentence as follows: You have been indicted by the grand jury of the district, for the violation of an important trust—the commission of a grave and serious crime. After a fair trial, in which you have had the aid of able, experienced and devoted counsel, and the sympathy and prayers of many warm friends, you have been found guilty as charged, by an honest and intelligent jury of your country. By a motion for a new trial, argued ardently and at great length in your behalf, the court has been compelled to review the testimony upon which this verdict was given. After a careful examination and consideration of the facts and circumstances proven against you, the court is bound to approve of the verdict and pronounce upon you the sentence which the law has provided for those who violate it. I will not harrow your feelings nor prolong this painful duty by indulging in any reflections or suggestions upon your present unfortunate condition and future prospects. The occasion will suggest to you and those present, all that I could say, and more. The jury have recommended you to the mercy of the court, and your former good reputation is in proof. So far as the court knows or can see, this is your first crime. The amount stolen is comparatively small, and no one but the Omniscient can know or estimate the force of the temptation which in an evil hour for yourself and friends, caused you to stumble and fall. The law provides that in the discretion of the court you may be sentenced to imprisonment at hard labor for a period not less than ten nor more than twenty-one years. In consideration of the circumstances just enumerated—particularly the recommendation of the jury and your past good reputation, the court has concluded to fix your imprisonment at the term of twelve years; and does now sentence you to be imprisoned at hard labor for the term of twelve years from this time. And as the legislature of this state has not yet provided for the admission of United States convicts into the state penitentiary, it is ordered that this sentence be executed in the jail of Multnomah county, so far as the discipline of such prison will permit, until the further order of this court, or it is otherwise by law provided.